IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE SELECT GROUP HOLDING COMPANY, LLC, a limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>BH ZENITH, Inc., a corporation, ZACHRY HOPKINS, an individual, TAMERA MARTIN, an individual, JASON HERMAN, an individual, and KEVIN HIGMAN, an individual,<br><br>Defendants. | Case No.<br><br>COMPLAINT |

Plaintiff The Select Group Holding Company, LLC ("Plaintiff" or "Select Group"), by and through its undersigned attorneys, as and for its Complaint against (a) defendant BH Zenith, Inc. ("BH Zenith"), and (b) defendants Zachry Hopkins ("Hopkins"), Tamera Martin ("Martin"), Jason Herman ("Herman") and Kevin Higman ("Higman") (collectively, the "Individual Defendants", and, together with BH Zenith, the "Defendants"), alleges on personal knowledge, except where indicated that such allegations are on information and belief, as follows:

## NATURE OF THE ACTION

1. This is an action to recover damages caused by fraudulent and misleading representations made by Defendants in connection with Select Group's purchase from BH Zenith of all of the equity securities of Bluehawk, LLC

("Bluehawk"), a limited liability company engaged in the IT staffing, project-based consulting and managed services business (the "Transaction").

2. In deciding to proceed with the Transaction, Select Group relied on representations made by Defendants in June and July 2024 regarding the substantial growth in revenues generated from Bluehawk's significant "SOW-aligned" support business with Blue Origin—one of Bluehawk's largest and fastest growing clients.

3. On September 25, 2024, two weeks before the Transaction was to close, Defendants disclosed to Select Group that they received informal information suggesting that Blue Origin would focus on cost control heading into the end of 2024, but that Defendants continued to foresee substantial growth in that business over time. On November 1, 2024, Defendants formally amended their disclosure schedules to the Purchase Agreement regarding the SOW business with Blue Origin to represent that Defendants had received "informal" information suggesting that Blue Origin anticipated changes to its SOW business with Bluehawk. Defendants continued to tell Select Group that Bluehawk would experience substantial growth in its business with Blue Origin.

4. In reliance on the truthfulness and completeness of Defendants' representations and disclosures concerning Bluehawk's business with Blue Origin, on November 8, 2024, Select Group entered into and closed an Amended and Restated Purchase Agreement (the "Purchase Agreement") and Assignment of Company Securities Agreement for the purchase and sale from BH Zenith of 100% of the equity securities of Bluehawk (the "Closing").

5. Beginning immediately after the Closing, revenues from Bluehawk's SOW business with Blue Origin began to decline. By the end of January 2025, revenues from Bluehawk's SOW business with Blue Origin declined to nearly zero and have failed to recover, resulting in a drastic diminution in value of the Bluehawk equity securities purchased by Select Group.

6. Upon investigation, Select Group discovered, in Bluehawk's files, emails among Defendants showing that they knew in September 2024 that Blue Origin revenues were going to go to "zero" effective December 31, 2024.

7. These emails were concealed from Select Group before the Closing and show that Defendants' September 25, 2024 statements and November 1, 2024 amendments to their disclosure schedules were false and misleading.

8. Defendants actively concealed this material information from Select Group and misled Select Group into believing that any decline in revenue from Blue Origin would be temporary and that Blue Origin revenue would continue to experience significant growth in the long term.

9. Defendants' misrepresentations and omissions caused Select Group damage by substantially diminishing the value of the Bluehawk equity securities purchased by Select Group.

10. Select Group would not have purchased the Bluehawk equity securities if it had known the truth about the expected downward trajectory of the revenue attributable to Blue Origin.

## PARTIES

11. Select Group is a Delaware limited liability company, with its principal place of business in Raleigh, NC.

12. On information and belief, BH Zenith is a Washington corporation.

13. On information and belief, Hopkins is an individual who resides in the State of California. Hopkins acted as the Representative for all Defendants during the negotiation and finalization of the Transaction.

14. On information and belief, Martin is an individual who resides in Washington State.

15. On information and belief, Defendant Herman is an individual who resides in Washington State.

16. On information and belief, Higman is an individual who resides in Washington State.

17. At the time of the November 8, 2024 closing of the Transaction, the Individual Defendants collectively owned all of the issued and outstanding stock of BH Zenith.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the common law claim asserted in this action.

19. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this is a civil action where the matter in controversy exceeds the sum

or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

20. Venue is proper in this district because Section 12.01(o) of the Purchase Agreement provides for the exclusive jurisdiction and venue of all disputes in the federal or state courts located in Delaware.

## SUBSTANTIVE ALLEGATIONS

### Select Group justifiably relied on Bluehawk EBITDA to value the Transaction

21. Select Group provides custom, backend solutions in cloud and infrastructure, cybersecurity, data and artificial intelligence, digital transformation, learning and development, and project management and agile, for companies looking to efficiently implement strategic initiatives.

22. On or about December 30, 2023, Select Group entered into a letter of intent (the "LOI") with Defendants for the purchase and sale of the equity securities of Bluehawk.

23. The LOI contemplated a purchase price of $47 million, with $40.2 million paid in cash at closing and $6.8 million contingent upon the performance of the Bluehawk business after closing.

24. Select Group arrived at the LOI price based on its analysis of Bluehawk's customer base and the adjusted earnings before interest tax, depreciation and amortization ("EBITDA") of Bluehawk's business, as reported by Defendants in a Confidential Information Memorandum (the "CIM").

25. In particular, Select Group was interested in Bluehawk's prominent "SOW"[1] enterprise staffing clients, such as Microsoft and Blue Origin, and the revenues the SOW staffing business was generating for Bluehawk.

26. Upon completing certain due diligence, on April 1, 2024, Plaintiff revised its purchase price down to $44 million total consideration, with $35 million paid in cash at closing and $9 million paid as an earnout contingent upon the performance of the Bluehawk business after closing.

27. Defendants requested in June 2024 and July 2024 to "re-price" the Transaction higher based on records they produced purporting to show substantial growth in revenues generated from Bluehawk's SOW business with Blue Origin.

28. Defendants presented Select Group with figures purporting to show that revenues from Bluehawk's SOW business with Blue Origin had grown from zero in 2020 to approximately 46% of Bluehawk's total revenues as of June 2024.

29. After further negotiations, Select Group and Defendants entered into an Asset Purchase Agreement on July 31, 2024, which structured the Transaction as an asset purchase transaction and provided for a "Base Closing Purchase Price" of $39 million and "Earnout Payment(s)" of up to $13 million based on the occurrence of certain events after the effective time of Closing.

[1] The acronym "SOW" refers to Statement of Work and is used in the business to refer to direct engagements between Bluehawk and a client to provide services specified in a written statement of work.

30. Select Group reasonably and justifiably relied on the revenue growth figures provided by Defendants in agreeing to the re-pricing of the Transaction in the Asset Purchase Agreement.

**Defendants controlled and limited Select Group's access to information regarding Blue Origin's business with Bluehawk.**

31. Pursuant to the terms of the Asset Purchase Agreement, the closing was scheduled to occur upon conclusion of the "Interim Period," during which the parties agreed to satisfy the conditions to closing.

32. Among other things, Defendants agreed to provide to Select Group during the Interim Period information regarding Bluehawk's business and revenues, including introducing representatives of Select Group to certain contacts at Bluehawk's customers, including Blue Origin.

33. At all relevant times, however, Defendants controlled Select Group's access to information concerning Blue Origin and Select Group's access to representatives of Blue Origin.

34. Defendants scheduled for August 30, 2024 an introductory teleconference between Su Wise, a Senior Program Manager at Blue Origin, and representatives of Select Group.

35. Defendants chose Su Wise as the Blue Origin representative for Select Group to speak to about the business relationship with Bluehawk. Select Group did not have the option to speak with any other representatives from Blue Origin about the relationship.

36. During the August 30, 2024 teleconference with Su Wise, and a follow-up call on or about September 9, 2024, George Karakostantis and Paul Griffin of Select Group were afforded an opportunity to ask questions regarding Blue Origin's business with Bluehawk.

37. When asked about Blue Origin's SOW business with Bluehawk, Ms. Wise reported that she anticipated some focus on savings in the last few months of 2024 but was not aware of any changes to the current SOWs between Blue Origin and Bluehawk.

38. Upon information and belief, the Individual Defendants knew that Ms. Wise did not have the same information that Defendants had received regarding the mandate from Blue Origin leadership to decrease Blue Origin's level of spend with Bluehawk to zero. They were confident that Ms. Wise was not going to give Select Group the message that "the sky was falling," even though the Individual Defendants were aware that the Blue Origin business was about to drop to virtually zero.

39. In and around October 2024, Defendants requested to re-structure the Transaction from an asset purchase agreement to an equity securities purchase agreement. The parties agreed and anticipated closing in early November 2024.

**Defendants make a last-minute false and misleading disclosure regarding the Blue Origin SOW business**

40. In Section 4.06(b) of the Purchase Agreement, Defendants, jointly and severally, represented and warranted to Select Group that "the following" "is accurate and complete as of the Closing Date":

> (b) Since December 31, 2023, there has not been (i) any adverse change in the financial condition, results of

> operations of the Company, or any decrease in the revenues realized from or rates payable under the Contracts; or (ii) any strike, labor trouble, employee dispute, contract dispute, or other similar claim or event, actual or, to the Company's Knowledge, threatened, adversely affecting, or which could adversely affect, the Business. Since the most recent Financial Statements, there has not been any change in any of the accounting (or Tax accounting) policies, practices, or procedures of the Company.

41. In Section 4.12(c) of the Purchase Agreement, Defendants, jointly and severally, represented and warranted to Select Group that "the following" "is accurate and complete as of the Closing Date":

> (c) Except as disclosed in Schedule 4.12(c), the Company has not received any notice (written, electronic or oral) from any of its customers or clients informing the Company that they intend to cease doing business with the Company, terminate any Material Contract prior to its expiration date, not renew any Material Contract, or reduce the revenues or rates they pay to the Company under any Material Contract. To the Company's Knowledge, none of the Company's customers or clients intends to cease doing business with the Company, terminate any Material Contract prior to its expiration date, not renew any Material Contract, or reduce the revenues or rates they pay to the Company under any Material Contract. The Company has not received any notice (written, oral or electronic) from any of its customers or clients informing the Company that it will not, and the Company has no reason to believe that any customer or client will not, do business with the Company (or adversely change the terms of its existing business relationship with the Company) immediately following Closing. No joint venturer or partner to any Material Contract has informed the Company of its intention to terminate (or adversely amend) any of the Material Contracts to which it is a party or, as the case may be, not to renew any of them at least on the same terms and conditions as currently exist.

42. Select Group reasonably relied upon the representations and warranties in Sections 4.06(b) and 4.12(c) to believe that Defendants were not aware of any changes to the impressive growth in Bluehawk's SOW business with Blue Origin.

43. On September 25, 2024, Defendant Herman sent an email to Mr. Karakostantis and Mr. Griffin regarding "a heads up on what we are hearing at Blue Origin."

44. Defendant Herman stated that Defendants "are hearing there is a direction from leadership to reduce all SOW contractors by year end" but that Defendants "aren't sure how seriously to take that."

45. Defendant Herman further stated in his September 25, 2024 email that:

> It seems clear that this is what Su was referring to when she mentioned there would be some churn at the end of the year and to 'hang with' them as it will come back next year. We've also seen this cycle before, as they went down to zero in 2023 and then came back strong later in the year. In any case, I do think we will see attrition in our business and a fair number of FTE conversions at the end of the year. We aren't super concerned, as we've heard these kinds of things before at other accounts toward the end of the year. Also, if you guys have seen our financials for August ($6.6M in revenue and $1.1M in net income), we have plenty of cushion to weather the storm until it comes back.

46. On November 1, 2024—days before the transaction was expected to close—Defendants supplemented Schedule 4.06(b), which is incorporated into Schedule 4.12(c) to the Purchase Agreement with the following disclosure regarding the Blue Origin business:

> (b) 2. From informal conversations with certain Blue Origin personnel, the Company believes Blue Origin plans to reduce its level of spend with Company during Q4 2024 by an unknown percentage ("Blue Origin Change").

47. Select Group understood the November 1, 2024 supplemental disclosure in the context of Defendant Herman's September 25, 2024 email, in which Defendant Herman mentioned that he had received informal information regarding Blue Origin and stated that "[w]e've also seen this cycle before, as they went down to zero in 2023 and then came back strong later in the year. . . . We aren't super concerned, as we've heard these kinds of things before at other accounts toward the end of the year."

48. In deciding to proceed to the closing on November 8, 2024, Select Group justifiably relied on the completeness and accuracy of Defendant Herman's statements in the September 25, 2024 email and Defendants' representations and disclosures in Sections 4.06(b) and 4.12(c) and their corresponding schedules.

**Select Group discovers that Defendants' representations were false and misleading**

49. In and around January 2025, revenues from Bluehawk's SOW business with Blue Origin fell to zero.

50. When revenues from Bluehawk's SOW business with Blue Origin failed to recover by February 2025, Select Group began an investigation.

51. Upon review of Bluehawk's email server, Select Group discovered a series of emails between Blue Origin and Defendants, and internal emails among Defendants themselves, that were never provided to Select Group during due diligence or the Interim Period.

52. In a September 17, 2024 email from Veronica Garcia, Senior Functional Manager Project Engineering at Blue Origin, to Melissa Fiske, an employee at Bluehawk, Ms. Garcia notified Ms. Fiske that Blue Origin "is moving towards driving

SOW-aligned support to 'zero' (with very few exceptions) by the end of 2024" and "this includes the BE-4 program as well."

53. Ms. Fiske promptly forwarded the email to Defendant Herman with the remark: "Yea-this is bad. I have a call with ali and dino today and will let you know what they say." "Ali" is Ali Rocco, a representative for Procurement/Supply Chain at Blue Origin, and "Dino" is Dino Barletta, Subcontracts Administrator II at Blue Origin.

54. Upon information and belief, Ms. Fiske confirmed with Ali and Dino that Blue Origin would be decreasing its level of spend for SOW work to almost zero by the end of 2024 and Ms. Fiske relayed this information to Defendant Herman.

55. In a subsequent September 17, 2024 email from Defendant Herman to the other Individual Defendants, Defendant Herman stated "[i]t does sound like leadership [at Blue Origin] is pushing to cut all contractors by the end of the year (both for SOW and staff aug)."

56. Defendant Herman goes on to state: "I don't think this merits any special communication to TSG [The Select Group]. I think we can just share with them at the next opportunity that we are hearing different things from different people. We can share that the leadership mandate is one of the things we are hearing, but we are also hearing from our biggest buyers that they are pushing for renewal for the rest of this year and into next. They can ask Su whatever questions they want if we ever get her on a call. I don't think she will give the 'sky is falling' message."

57. Defendant Hopkins responded to Defendant Herman on the same day stating: "Thanks for the update, Jason! I agree with you on the approach. This is really business as usual for our line of business. Let's hope we get the meeting with TSG and Sue scheduled soon and close the final loop on the requirements we need to deliver prior to closing."

58. In an October 2, 2024 email from Stephen Dela Cruz, Manager, BE-3PM Project Engineering at Blue Origin, to Ms. Fiske, Mr. Cruz stated "Have you given the Bluehawk folks a heads up that their contracts are due to expire no later than EOY?"

59. On October 18, 2024, Ms. Fiske sent an email with the subject "Blue Origin, LLC Revised Purchase Order #10556691" to Defendant Herman and other staff at Bluehawk stating: "This is an update to 12/31 . . . . it was march 2025. So it's happening ….. the roll off."

60. Defendants never disclosed to Select Group the contents of the foregoing emails.

61. Instead of other, more knowledgeable Blue Origin representatives, Defendant Herman and the other Defendants selected Su Wise to speak to Select Group because Defendants knew that Ms. Wise lacked full knowledge of Blue Origin's plan to reduce its SOW business to zero.

62. In the same September 17, 2024 email described in Paragraph 55 above, Defendant Herman describes Defendants' motivation to select Su Wise as the Blue Origin representative to speak to Select Group: "They can ask Su whatever questions

they want if we ever get on a call. I don't think she will give the 'sky is falling' message."

63. Defendants did not give Select Group an opportunity to speak with any other representative of Blue Origin before the Closing.

64. Prior to the Closing, Defendants exercised their control over Select Group's access to representatives of Blue Origin to ensure that Select Group would be unable to learn the truth about Blue Origin's plan to reduce its SOW business with Bluehawk to zero.

**Defendants' representations were false and misleading half-truths.**

65. The statements in Defendant Herman's September 25, 2024 email were false and misleading because at the time those statements were made, Defendant Herman knew that Blue Origin intended to reduce its SOW spend to zero by the end of 2024.

66. Defendant Herman's representations in the September 25, 2024 email were misleading because his statement that there would be only a slight dip in SOW revenues from Blue Origin before they return to ordinary levels was presented as informed experience, when it was nothing more than baseless speculation in the face of clear communications to the contrary from Blue Origin.

67. Defendants' November 1, 2024 supplement to Schedules 4.06(b) and 4.12(c) was false because the supplement suggests that the expected change in Blue Origin revenues was unknown when Defendants knew the specific amount—a 100% reduction in revenues.

68. Defendants' November 1, 2024 supplement to Schedules 4.06(b) and 4.12(c) was false and misleading for the additional reason that the supplement suggested that the information concerning a reduction in revenue from Blue Origin was uncertain and could not be trusted because it was from "informal conversations with certain Blue Origin personnel" when Defendants knew that the reduction was certain and that the sources at Blue Origin were reliable.

**Defendants' misstatements and omissions were material.**

69. Select Group was motivated to complete the Closing because Bluehawk's revenues from Blue Origin work showed substantial growth.

70. Revenues from other customers of Bluehawk were static or otherwise showed much lower rates of growth as compared to Blue Origin.

71. Select Group relied on this growth from Blue Origin business in valuing Bluehawk at approximately 11 times EBITDA.

72. But for the growth in revenue from Blue Origin, Select Group would have applied a lower EBITDA multiple to a lower EBITDA amount in valuing Bluehawk and agreed to a substantially lower purchase price for Bluehawk's equity securities.

**Defendants also schemed to defraud Select Group.**

73. In addition to failing to provide accurate information, the disclosure that Defendants did make was part of their scheme to defraud Select Group.

74. As described in Paragraphs 57 and 58, above, Defendant Herman suggested to the other Individual Defendants that they not disclose the full truth to

Select Group and that they downplay the bad news they had received from Blue Origin.

75. Defendant Hopkins agreed with this approach by email.

76. Upon information and belief, Defendants Martin and Higman also agreed with the plan to deceive Select Group.

**Defendants acted with scienter.**

77. Defendants' misstatements and omissions were made knowingly or recklessly and for the purpose and effect of concealing the truth about the expected trajectory of the Blue Origin revenue.

78. As detailed above, Defendants had actual knowledge in September 2024 that Bluehawk's revenue from Blue Origin SOW business would fall to zero by December 2024.

79. Follow-up emails from others at Blue Origin and the revised purchase order from Blue Origin confirmed by October 18, 2024, that the Blue Origin level of spend would decrease to practically zero by the end of 2024.

80. Defendants were motivated to conceal and mislead the truth because they knew that the EBITDA amount and EBITDA multiple used by the parties to value Bluehawk and set a purchase price was based primarily on the substantial reported growth in Blue Origin revenues for the twelve-month period prior to the Closing.

81. Defendants knew that a higher EBITDA amount and higher EBITDA multiple would lead to a higher purchase price and a higher personal economic benefit upon the closing of the Transaction.

82. Defendants knew or should have known that Select Group would not have gone through with the Transaction on the terms set forth in the Purchase Agreement if Blue Origin's SOW business with Bluehawk was reduced to zero.

83. Upon the closing of the Transaction, Defendant BH Zenith received a Base Purchase Price of $39 million, which was paid directly in cash, or indirectly by Select Group's payment of expenses and debt on BH Zenith's behalf, along with a deposit made into escrow on BH Zenith's behalf.

84. On information and belief, the proceeds received by BH Zenith upon the closing of the Transaction were distributed by it to the Individual Defendants, BH Zenith's stockholders.

85. Defendants' scienter is further evidenced in the September 17, 2024 email exchange where they agreed that they would not make "any special communication to" Select Group regarding the Blue Origin information in Defendants' possession.

86. Defendants' scienter is further evidenced by their agreement to mischaracterize and obfuscate the truth in the September 25, 2024 email and the November 1, 2024 supplemental disclosure.

87. More specifically, in the September 17, 2024 email exchange, Defendants agreed to mislead Select Group by saying that Defendants "are hearing different things from different people."

88. Defendants acted on their intent to mislead by stating in the September 25, 2024 email to Select Group that Blue Origin's business "will come back next year,"

"[w]e've also seen this cycle before," and "[w]e aren't super concerned, as we've heard these kinds of things before at other accounts toward the end of the year."

89. The foregoing statements were misleading in light of the certainty of the information provided to Defendants by Blue Origin.

90. Defendants also acted on their intent to mislead by suggesting in the November 1, 2024 disclosure that the information they had received from Blue Origin was unreliable because it had come from "informal" sources when the sources were reliable and accurate.

**Justifiable reliance.**

91. Select Group justifiably relied on the statements made by Defendants, because Defendants represented and warranted in Sections 4.06(b) and 4.12(c) of the Purchase Agreement the truthfulness of their statements.

92. At all relevant times, Defendants controlled Select Group's access to information from Blue Origin.

93. Upon information and belief, Defendants chose to introduce Select Group to Su Wise because Defendants knew that she would lack substantive information about Blue Origin's plans for its SOW business with Bluehawk.

94. Additionally, Section 12.01(m) of the Purchase Agreement states: "All representations and warranties made herein or in any of the other documents or instruments executed or delivered by the Seller Parties in connection herewith shall be deemed material and relied upon by Buyer, regardless of any notice to or investigation made by Buyer (or on Buyer's behalf)." The "Seller Parties" are the named Defendants in this action.

**Loss causation.**

95. Defendants' misstatements and omissions proximately caused Select Group to overpay for Bluehawk and suffer damages.

96. Defendants' half-true statement about the expectations for the Blue Origin revenue gave Select Group false comfort. The statement itself was designed to mislead. Instead of disclosing what Defendants had been told by Blue Origin and, therefore, knew to be true—that Blue Origin was planning to essentially stop doing business with Bluehawk after the Transaction—Defendants led Select Group to believe only that the business was likely to dip in similar cyclical nature as it had done in the past.

97. If Defendants had disclosed the truth—that Blue Origin had informed them that it intended to decrease its level of spend to zero by the end of 2024, Select Group either would not have completed the Transaction or would have bargained for a significantly decreased purchase price. By omitting the truth, Defendants induced Select Group to complete the Transaction at an inflated purchase price.

**FIRST CAUSE OF ACTION**

**Violation of § 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder (Against all Defendants)**

98. Plaintiff re-alleges each of the foregoing paragraphs, as if fully set forth herein.

99. As specifically detailed herein, Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or

omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Plaintiff in connection with the transaction in an effort to benefit Defendants, individually or collectively, at the expense of Plaintiff, in violation of §10(b) of the Exchange Act and Rule 10b-5.

100. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the value of the enterprise purchased in the transaction.

101. As set forth more particularly herein, Defendants had actual knowledge of the misstatement and omission of material facts set forth herein. Defendants' material misstatement and omission was knowing or reckless and for the purpose and effect of concealing the truth about the foregoing from Plaintiff. Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

102. As a result of the dissemination of the materially false and/or misleading statement and/or failure to disclose material facts, as set forth above, Defendants induced Plaintiff to enter into the Purchase Agreement and an Assignment of Company Securities Agreement for the purchase and sale of 100% of the equity

securities of Bluehawk at the Base Closing Price of $39 million and Earnouts of up to $13 million.

103. At the time of Defendants' misstatements and omissions, Plaintiff was ignorant of the falsity of the misstatement and reasonably believed it to be true.

104. Plaintiff relied on Defendants to disclose all material facts truthfully.

105. Had Plaintiff known the truth regarding the foregoing, which was not disclosed by Defendants, Plaintiff would not have entered into the Transaction or would have bargained for a significantly decreased purchase price.

106. Upon the drastic reduction in SOW revenues from Blue Origin, the value of the Bluehawk equity securities purchased by Select Group has been substantially diminished.

107. By virtue of the foregoing, Plaintiff has suffered a calculable loss.

108. As a direct and proximate result of Defendants' wrongful conduct, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in connection with the purchase and sale of BH Zenith equity securities.

## SECOND CAUSE OF ACTION

**Common law fraud**
**(against all Defendants)**

109. Plaintiff re-alleges each of the foregoing paragraphs, as if fully set forth herein.

110. As detailed above, Defendants misrepresented the expected trajectory of Blue Origin's level of spend by year end 2024 and omitted the key facts that

Defendants had been notified by Blue Origin that the leadership mandate was to decrease the level of spend to practically zero by year end 2024.

111. The Individual Defendants knew that the disclosure they provided to Select Group, and that they caused BH Zenith to provide to Select Group, was false and misleading and omitted the key fact that the Blue Origin revenues were likely to decrease to zero by year end 2024.

112. Plaintiff acted in justifiable reliance on the representations made by Defendants, including the disclosure provided, because the parties were engaged in a transaction and had a duty to provide accurate, non-misleading information about the expected trajectory of Blue Origin's level of spend.

113. Plaintiff was injured by its reliance because the price it agreed to pay for Bluehawk's equity securities was determined based on the representations by Defendants that Blue Origin's level of spend would continue to grow.

114. Plaintiff agreed to the purchase price for Bluehawk's equity securities without knowing that Blue Origin's business with Bluehawk was expected to decrease to zero by the end of 2024.

115. If Defendants had disclosed the truth to Select Group, Select Group would not have entered into the Transaction or would have only agreed to complete the transaction at a substantially reduced price.

## THIRD CAUSE OF ACTION

**Declaratory Judgment**
**(against all Defendants)**

116. Plaintiff re-alleges each of the foregoing paragraphs, as if fully set forth herein.

117. By way of the foregoing, Defendants are in material breach of the Purchase Agreement.

118. Defendants' material breach terminates Select Group's obligation under Section 2.04 to pay to Defendants any Earnout Payments.

119. Accordingly, Plaintiff is entitled to declaratory judgment that Defendants are not entitled to any Earnout Payments or any other payment obligation under the Purchase Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, and for such other relief as follows:

a. On the First Cause of action, awarding Plaintiff damages in an amount to be determined at trial but no less than $75,000; and

b. On the Second Cause of Action, awarding Plaintiff damages in an amount to be determined at trial but no less than $75,000; and

c. On the Third Cause of Action, awarding Plaintiff declaratory judgment that Defendants are not entitled to any Earnout Payments or any other payments under the Purchase Agreement; and

d. Disgorgement of Defendants' ill-gotten gains resulting from the conduct alleged herein; and

e. Imposition of a constructive trust over Defendants' ill-gotten gains derived from the conduct alleged herein; and

f. Awarding Plaintiff prejudgment interest at the maximum rate permissible under law; and

g. Awarding Plaintiff its attorneys' fees and costs of litigation (including expert fees) (pursuant to Section 12.01(o) of the Purchase Agreement); and

h. Awarding Plaintiff costs, disbursements, and expenses in an amount to be determined at trial, plus interest; and

i. Such other and further relief as this Court deems just and proper.

Dated: November 12, 2025

/s/ *Thomas A. Uebler*
Thomas A. Uebler (#5074)
Terisa A. Shoremount (#7113)
McCOLLOM D'EMILIO SMITH UEBLER LLC
2751 Centerville Rd. Suite. 401
Wilmington, DE 19808
(302) 468-5963
tuebler@mdsulaw.com
tshoremount@mdsulaw.com

Michael James Maloney
(pro hac vice admission expected)
Rosanne E. Felicello
(pro hac vice admission expected)
FELICELLO LAW P.C.
366 Madison Ave, 3rd FL
New York, New York 10017
Tel. (212) 584-7806
mmaloney@felicellolaw.com
rosanne@felicellolaw.com

*Attorneys for Plaintiff Select Group*